May it please the Court, good morning. I'm pleased to be in Seattle as well on a beautiful day like this. My name is John Waddell. My co-counsel, Timothy McCormick, is here with me. We represent the plaintiff-appellant cross-respondent, Washington Shoe Company. As you know, this is a case about the reach of personal jurisdiction in federal court intellectual property cases. The case will determine whether an Arkansas company can develop an ongoing business relationship with a Washington company, apply for credit, buy goods that are protected by copyright or that contain copyright-protected designs, and then knowingly procure and sell illegal knockoffs of those goods side by side with the legitimate goods and still avoid being hailed into federal court in Washington. Beyond that, can the Arkansas company receive a cease-and-desist letter and then willfully infringe by making a bulk sale of all its remaining infringing goods? Under copyright law, is there a difference between them violating the copyright sort of inadvertently, that is by ordering Chinese goods they may or may not have known were not yours, and then willfully selling them once they've received the cease-and-desist order? Is there a difference under copyright law? Is there a difference in damages that you may receive? There's a difference in damages. There's also a difference in the level of culpability. You can have an intentional action or you can have a willful action. And certainly once a cease-and-desist letter is received, there's no question that the action becomes willful. What's the proof here of purposeful availment by AZ Sporting Goods? The Calder v. Jones case suggests that that purposeful availment portion of the three-part jurisdictional test, that they call it purposeful direction, and they have a- Well, Calder involved a Florida-based national inquirer that wrote an article about Shirley Jones and said basically she was a drunk and that's why she wasn't getting acting jobs, but 80-something percent of their circulation went to the state of California. That's correct. So what is it here? The purposeful direction toward the state of Washington, if you look at the Brayton Purcell case, in this case- I'm asking you for facts. I'd like to give you a short list of those facts that you say support the notion that AZ Sporting Goods purposefully availed itself of Washington jurisdiction. A to Z established an ongoing business relationship with a Washington company. It procured goods from the Washington company with copyrighted designs, received catalogs from the Washington company, and had a relationship with that company whose nexus was in Washington. The harm, all of the harm in this case, is to the intellectual property that is in the state of Washington, those copyrighted designs. And the real critical portion of that Calder effects test or the Brayton Purcell test or whatever is, is this express aiming at the forum state? And the way various cases have phrased what express aiming means is that it requires something more than just knowing that the resident plaintiff is in the forum state. And the something more in Brayton Purcell and various other-the recent cases since that, Mavericks, Photos, College Source, was competition. And in this case, we have direct competition. These booths, the knockoff booths, which were exact copies, were sold side by side with Washington shoes designs in direct competition. In Arkansas? In Arkansas, but also this company had an Internet presence to the tune of 50,000 transactions over three years, nearly half a million dollars in sales. Now, isn't that done by a different company? These companies- And I didn't think that you were able to establish- You didn't sue that other company, did you? We sued A to Z Sporting Goods, Inc. Right, but you didn't sue the entity. It also says A to Z something or other, but- A to Z Factory Clothes. Right, but you didn't sue them. Right. We have this court's jurisprudence in Baumann v. Daimler Chrysler established as a test for when you attribute contacts of an affiliate to another company. And the test is basically are they pervasively joint operations and do the companies provide services to one another? In this case, you have six stores in one. That's how they're advertised. They're all in the same place. They all have the same manager. They all have the same telephone number, email address, website. Sounds like a good reason to join them all. Perhaps. So why didn't you? Well, that kind of shotgun pleading is generally discouraged. It didn't make sense to have all of the affiliates joined in the case if the contacts could be attributed. Your argument is that this other entity is closely related to the defendant in this case and that other entities' Internet activities establish the basis for jurisdiction. Is that right? My argument is that the Internet activities were on behalf of all of the A to Z companies, all of the six stores in one. That's how it was advertised on the Internet. The goods came from all of the stores and then were sold via eBay. I don't know how we can deal with this because you have a declaration in the record from Tanya Dre saying, look, I'm aware of A to Z factory closeouts, and you've just alleged all kinds of wrong facts about this. This Court's standard of review... Independent management or independent self-sufficient corporations. This may be a fairly weak ground. If you haven't bothered to sue them, this may be a fairly weak ground on which you're going to base your jurisdiction. It may be, and I think specific personal jurisdiction is so clear in this case that... Then you don't need to make that argument. That argument doesn't necessarily need to be made. The one thing I will say is that this Court resolves conflicting affidavits, and that's what we have here, different perspectives and affidavits in favor of the plaintiff. This case was resolved on the pleadings. There was no evidentiary hearing, and all inferences are to be resolved in favor of the plaintiff in this case. If you're successful in your suit on the merits, you can recover damages? Yes. Attorney's fees? Potentially. Treble damages? Perhaps on the willfulness portion. Would any of that change if you were in the district court, the U.S. District Court in Little Rock? No, Your Honor. The difference in the district court in Little Rock, and it's one of the reasons this case is so important, is U.S. manufacturers are subject to this kind of knockoff sales all over the country constantly, and so if there's a way for a company to get jurisdiction in its home state, that's much more economically advantageous. It costs us way more to litigate in Arkansas than to litigate in Washington. The witnesses are in Washington and so forth, and so to go to Arkansas or wherever it might be, Oklahoma, Massachusetts, anywhere that this famous design is being knocked off presents great difficulties for U.S. companies. Does your argument for jurisdiction change if your cause of action is intentional versus willful? I believe so. Is your case stronger if it's a willful violation? Yes, and I believe once that cease and desist letter, in this case, two cease and desist letters were received, and then you have a willful bulk sale of all the infringing goods, knowing that that cease and desist letter has been received, knowing that there's copyright on those goods, there's absolutely no question that becomes a cannon shot in the direction of the forum state. I didn't get the details. I asked this question up front, but what's the difference in your remedies if it's a willful violation instead of an intentional violation? We get statutory damages in willful cases and other additional remedies under the Copyright Act. Your case for attorney's fees becomes stronger. Do you only have statutory causes of action, all under the copyright laws? Our case is under the U.S. Federal Copyright Act. There's no state, there's no common law tort actions here at all? No, Your Honor. Okay. Is an action in copyright considered to be a tort? Yes. Mr. Waddell, may I ask you this? If on receipt of the cease and desist orders, AZ, instead of calling in the Oklahoma jobber and selling boots to the Oklahoma jobber, had just dumped all those boots in a dumpster and gotten rid of them, would that make any difference? I believe it would. I think that the narrowing of this case could relate to the bulk sale of infringing goods after receiving the cease and desist letter. Is a part of your claim of purposeful direction or purposeful aiming that the sale of the boots to the Oklahoma jobber reduced the demand for similar products in Washington and therefore caused damage to your production and sales in Washington? Absolutely. Okay. It undercuts the price. If you sell all those boots for $1 apiece instead of $15 apiece, that greatly undercuts Washington Shoes' ability to sell its own ditzy dot or spider boots throughout the country and certainly in Washington. I would like to reserve the balance of my time for rebuttal. Okay. You may do so. Mr. Townsend? May it please the Court? Roger Townsend for Defendant A to Z Sporting Goods. Counselor, you're about to lose your glasses. Thank you. It's a sign I'm old enough to need them. May it please the Court? By the questions from the Court, I think what the focus here should be the degree to which A to Z Sporting Goods, not unrelated entities located at the same location, purposely availed itself of the forum in Washington. The record is undisputed that A to Z had no sales presence, no sales, and I prefer to A to Z Sporting Goods here. Mr. Townsend, do you agree with your learned friend that the sale of boots to Oklahoma Jobber reduced the demand for these boots from Washington Shoe and therefore reduced the production and sales of these boots in Washington Shoe, which is in Washington? I have two responses to that. Okay. One is I don't believe it's pertinent to the question of what's before the Court today. I believe that that is pertinent to the issue of copyright violation, which is available to the plaintiffs regardless. What's pertinent is whether the effect of the copyright infringement was felt in Washington and was known to be felt in Washington when you sold rather than destroyed the shoes. You put shoes on the market or boots on the market, which could conceivably reduce the demand for similar product in Washington and reduce the sales in Washington. You would admit that, don't you? Could conceivably, I think, is the critical point. Certainly as conceivably as the raising of marijuana by Mrs. Raich affected interstate commerce. Or the sale of an apple could affect interstate commerce. Your point is well taken, Your Honor. But first of all, the record is not really developed on this point. It doesn't have to be developed. You admitted in requests for admissions and also in answers to interrogatories that the offending boots were sold to an Oklahoma jobber, correct? Correct. And did he destroy them or did he sell them? We don't know the answer to that question, and it's not in the record. Can we presume that a jobber wouldn't buy boots simply to take them to the dump? I don't believe so, and I've done some investigation into that issue independently, but it's not in the record today. But you got money for the boots. Well, again, it's not developed, my understanding of that. And one of the frustrations that I have is that the plaintiffs here in this case are relying upon the deference they're afforded by the pleading standard and the approach. Even if they gave them to a thrift store, though, the damage to the shoe company might be predictable. That is, if they're kept in commerce in some sense, even if you're giving them away, you are giving away boots that are infringing on a copyright that people will acquire and therefore will not acquire in other ways, namely by going and purchasing them. Correct. But, again, these are not actions taken by A to Z sporting goods in Washington State. There's no contact by A to Z sporting goods in Washington State. This is essentially local business. It's selling hunting and fishing and sporting goods out of a single retail location. I asked counsel for Washington Shoe about the difference between an intentional copyright violation and a willful copyright violation. Did you agree with his characterization? Again, I think we're getting into the merits of the case. Right. I am asking about that. But is there a difference? Is there a willful violation that's different from an intentional violation of the copyright laws? I would concur that it's a question of damages, but that I would not concur that it's a question that's salient to the issue of personal jurisdiction. If we were to affirm Judge Lasnik, I notice that attorneys' fees were asked for and denied on a discretionary basis. Let's say, just hypothetically, that we affirm Judge Lasnik. This case goes to district court in Arkansas. Do you agree that the fees incurred in this action, if fees are recoverable there, could be combined, if you will? There are two independent grounds under which the court could grant attorneys' fees in this case, the Washington State jurisdictional statute and Section 505 of the Copyright Act. That is up to the discretion, would be then up to the discretion of the Arkansas district court judge, and they're afforded wide latitude. If the conclusion of the Arkansas district judge is that this was an unnecessary step, then my argument, or the Arkansas lawyer's argument, would be that the fees that are incurred in this litigation would not be recoverable. But, again, I don't believe that's before the court here. I assume one of the arguments that they're making is that if they're forced to go to Arkansas, they've expended substantial attorneys' fees here, and they may not be recoverable there. I take it you're conceding, without conceding the fees, that that's not necessarily so. They could recover the fees incurred here in an action in Arkansas. I think that would have to be briefed before that court in that issue. And, again, that was not briefed in this case, but my understanding is that that's a discretionary decision on behalf of the district court, and that both sides would, I'm sure, vehemently argue both sides of that. Why shouldn't this panel focus in on modern commerce and simply adopt a rule that says jurisdiction lies where the harm occurs? The precedent of the Ninth Circuit, and through the Brayton Purcells, and the Maverick case, and the Love Beach Boy case, and I would also direct the court to a recent district court case, Lang v. Morris, which is 823 F. Sub. 2nd. 966, which gives, I found an excellent summary, that it requires more than knowledge of the location of the plaintiff. It requires the intent to compete in that forum. So that if, and I go back to this business, which is- But isn't the forum of Washington Shoe 100 years in business? The United States? Including Washington? It's the forum- They sell everywhere, don't they? It's not like Brayton Purcell. In Brayton Purcell, Brayton operates in Northern California. Recordon operated in Southern California. Recordon, in the second case, could have operated in Northern California, and that changed the result. But here, Washington Shoe has always, at least since I was in law school, operated all over the country. And doesn't it differ? I think, Judge Baird, that we need to look at where the defendant, where the inquiry of the court is where the defendant is subject to personal jurisdiction in Washington. So it's the actions of the defendant- So unless Arkansas Sporting Goods tries to sell those boots in Washington, they can't be sued in Washington. Even if the sale of the boots causes the sales of the Washington company to decrease. Yes. Then they would have to bring the case in Arkansas. And this business that we're looking at is a classic brick-and-mortar business. It has no Internet presence. It does not have eBay sales. And I believe the record is clear that we can't look to those issues. And there were some district court orders, which were requesting extended jurisdictional discovery, and where Judge Lasnik made the point that all these facts were knowable at the outset. All these facts related to the other A to Z entities were all knowable and known to the plaintiff at the time of suit. And they had ample opportunity. They had an extended opportunity to conduct jurisdictional discovery. And the facts, the only fact that should give this panel pause- Among the cases that you were telling us we should follow, Burt and Purcell, the Beach Boys case, you didn't mention Schwarzenegger. Do you want to talk about the similarities and dissimilarities between Schwarzenegger and this case? Thank you. I appreciate the invitation. Yes. Schwarzenegger is obviously an excellent case for defendants in this matter. And a couple of highly analogous facts here. One is, in that case, there can be no doubt that the defendant was well aware that Governor Schwarzenegger was governor of California and constructive knowledge of the location where the harm would occur. But again- The harm in Ohio might reduce Schwarzenegger's image nationwide. Correct. And yet the court found no jurisdiction in that case. And they were selling- There was this dilution, abstract dilution approach. But I think once the court- It becomes a slippery slope. Once you allow for these kind of- Sale of an apple affects- In Washington on a private farm affects interstate commerce, then the constitutional due process bar for personal jurisdiction really becomes obliviated. Everything can affect everything in some theoretical way. We don't really have tangible evidence that any of these boots- So you would argue there's a distinction between sufficient effect on interstate commerce and the constitutional requirements of fair play for personal jurisdiction. Well, I don't think we get to the third prong of the- And I think the focus of the inquiry before the court is really on the purposeful availment and express aiming analysis. And I think that's where the Judge Lasnik's decision below was correct, that we don't have express aiming in this case. Counsel, are you familiar with our decision in Maverick's photo versus brand technologies? Yes. Okay. Then what do we do- That's a case where we had a Florida company suing somebody from Ohio, but sued them in California for damages there. And it's a copyright case. But twice our court said, of course, he could have sued in either Ohio or Florida. Now, this case is much more like suing brand in Florida. So if our court assumed that a copyright suit could be brought at the company that held the copyright, what do we do? Well, I find that case distinguishable. And to your question, which I appreciate, is what we're talking there is about celebrity photos that are distributed via the Internet that are available worldwide. Right. And the issue there, of course, was whether they could be sued in yet a third jurisdiction, namely California. Correct. But our court twice said, of course, you could have sued the Ohio company in Miami. Right. Well, that would be dicta in that decision, but the point is well taken. But the court took it as an easy case. And I think the facts of, again, I go back to look at the nature of this business. This is not an Internet business. Broadcasting photographs available from any computer. We're talking about the Washington shoe salesman, Jesse James, came and found boots on the shelf. These are boots on the shelf. These are not intellectual property in the classic sense that is available all over the world. All right. Are you familiar with the American Buddha litigation in the Second Circuit? I'm not. Okay. In the Lang versus Morris, the Northern District of California case that I mentioned, that was an artist that sold product. To Judge Baez's point, this is a highly instructive case, albeit a district court case. But there the artist did a knockoff on origami designs. And then through the secondary market, which is what we're talking about here, they could have gone into the Northern California forum, but indirectly. And there was no evidence the defendant in that case was purposely availing herself, which was an artist, was purposely availing herself of the home forum. She existed in New York and London, and the district court there said no personal jurisdiction and went through a detailed analysis of Schwarzenegger and Mavericks and Love and Brayton Purcell and the Calder effects test. And I would reserve my final minute and 20 seconds for a rebuttal on our cross-appeal. Unless the court has questions. Mr. Waddell, how do you distinguish Schwarzenegger? The Schwarzenegger case involved a vehicle dealership that put an image of Arnold Schwarzenegger in its advertising to sell cars in the Midwest. There was no, it was a common law misuse of, misappropriation of likeness case. So you don't have a federal statutory damage scheme. But the most important distinction is there was no way, shape, or form in which there was competition between Schwarzenegger and that dealership. And the cases in this court, Brayton Purcell, Mavericks, College Source, are all about not actual competition, not you went and sold the boots in Washington, but potential competition. So in Brayton there was no evidence that Record On and Record On had any intention of practicing in Northern California, or that they did. It was merely the possibility that they could, that there could be competition between those two entities. And I think ultimately what the something more element, the express aiming element becomes, is the relationship between the forum resident plaintiff and the infringing defendant. And Schwarzenegger and the Ford dealership had no relationship whatsoever. They were complete strangers to one another and certainly were not in any sort of competition. I wanted to clear up, there was opposing counsel indicated that this is strictly a brick and mortar operation. Wait a minute. I'm sorry. The relationship, explain to me. Sure, there's a relationship between the manufacturer, Washington Shoe, and the shop in Arkansas. That's to other shoes. That's a contractual relationship. That if there were a breach of contract, there would be a suit for breach of contract and it might well take place here in Washington. But that doesn't have anything to do with the copyright violation and the tort, the common law tort, that may be a trade market violation, that sort of thing. So I don't see why just because they have a relationship, there's a difference between this case and Schwarzenegger. The difference is that they're competitors. It's that competitive relationship where they are selling boots into the same exact market, which is what the language and college source is. These two college catalog Internet companies are in the same market and competitive with one another, and there's the potential for competition within the forum state, and all the harm is in the forum state. And there was no such, no relationship of any kind, whether it's competitive, business relationship, anything like that, in either the Schwarzenegger case or the Pebble Beach case. No way a Bed and Breakfast in England is going to compete with a golf course in California. But there is certainly a way that A to Z competed with Washington Shoe, and I was going to correct the impression that A to Z Sporting Goods, Inc., that entity is a brick-and-mortar operation. It's not. It has an Internet presence. Page ER-246 shows their Internet page where they are advertising nationwide. But that's a passive Internet. You can't order shoes over that, can you? You can't, but you could certainly obtain those shoes via their other Internet sales operations. And those shoes that were bulk sold to Oklahoma, there's absolutely no question that there's the potential for competition everywhere, including in Washington, and that the harm, in terms of the reduction in the value of the intellectual property, takes place in Washington. What was the value of the shoes that were sold to the Oklahoma jobber? We don't know. What was the value or what were they sold for? It's not in the record. What was the value? I mean, how many pairs of shoes are we talking about? How many boots? We're talking about approximately 1,500 to two containers' worth, and the record doesn't reflect which one of those it was because we didn't obtain complete information. But the closest we can come is about 1,500 pairs were bulk sold. Thank you. Thank you. Mr. Townsend, you reserved time. I think this was only on your attorney's fees question. Is that correct? Well, I would rebut, but if it's nothing to rebut. There's nothing to rebut. Then we'll submit. Thank you. Okay. Thank you. We thank both counsel for the argument. Washington Shoe Company, Stacey Sporting. A very interesting case is ordered submitted on the briefs.
judges: Hawkins, Bybee, Bea